**UNITED STATES of America, by Ramsey CLARK, Attorney General of the United States**

**v.**

**PLAQUEMINES PARISH SCHOOL BOARD et al.**

**Civ. A. No. 66–71–A.**

United States District Court
E. D. Louisiana,
New Orleans Division.

June 27, 1967.

Louis C. LaCourt, U. S. Atty., Eastern Dist. of Louisiana, Hugh W. Fleischer, Atty., Dept. of Justice, for plaintiff.

Leander H. Perez, New Orleans, La., Leander H. Perez, Jr., Dist. Atty., Plaquemines Parish, Sidney Provensal, Jr., New Orleans, La., Atty., Plaquemines Parish School Bd., Luke Petrovich, Buras, La., Atty., Plaquemines Parish Commission Council, for defendants.

CHRISTENBERRY, District Judge.

The plaintiff, United States of America, having filed its complaint herein on July 19, 1966, and its amended complaint on August 5, 1966; and the Court having entered a preliminary injunction against the parties defendant on August 26, 1966, and supplemental orders subsequent thereto;

■ Now, therefore, it is hereby ordered, adjudged and decreed that the defendants together with their officers, agents, employees, successors and all those in active concert or participation with them be and each is hereby permanently enjoined as set out in the body of the decree:

Unless otherwise stated the provisions of paragraphs I through XVII shall apply to the defendant School Board, its members and superintendent or acting superintendent.

I. SPEED OF DESEGREGATION

Commencing with the 1967–1968 school year, in accordance with this decree, all grades, including kindergarten grades, shall be desegregated and pupils assigned to schools in these grades without regard to race or color.

## II. EXERCISE OF CHOICE

The following provisions shall apply to all grades:

(a) *Who May Exercise Choice.* A choice of schools may be exercised by a parent or other adult person serving as the student's parent. Each reference in this decree to a student exercising a choice means the exercise of the choice, as appropriate, by a parent or such other adult.

(b) *Annual Exercise of Choice.* All students, both white and Negro, shall be required to exercise a free choice of schools annually.

(c) *Choice Period.* The period for exercising choice for the 1967–1968 school year fixed by the School Board is extended to July 15, 1967. In the years following, the period for exercising the choice shall commence on March 1, and end on March 31, preceding the school year for which the choice is exercised. No students or prospective student who exercises his choice within the choice period shall be given any preference because of the time within the period when such choice was exercised.

(d) *Mandatory Exercise of Choice.* A failure to exercise a choice within the choice period shall not preclude any student from exercising a choice at any time before school commences for the year with respect to which the choice applies, but such choice may be subordinated to the choices of students who exercised choice before the expiration of the choice period. Any student who does not exercise his choice of school shall be assigned to the school nearest his home where space is available under standards for determining available space which shall be applied uniformly throughout the system.

(e) *Public Notice.* The defendants shall promptly arrange for the conspicuous publication of a notice describing the provisions of this decree and particularly of the extension of the choice period in either the New Orleans Times Picayune or New Orleans States-Item. The text of the notice shall be substantially similar to the text of the explanatory letter sent home to parents with such changes in text as may be necessary to conform to the provisions of this injunction. Publication as a legal notice will not be sufficient. Copies of this notice must also be given at that time to all radio and television stations serving the community. Copies of this decree shall be posted in each school in the school system and at the office of the Superintendent of Education.

(f) *Mailing of Explanatory Letters and Choice Forms.* There shall be distributed by first-class mail an explanatory letter and a choice form to the parent (or other adult person acting as parent, if known to the defendants) of each student who will be entering a grade in the system during the following year, including those students who were enrolled in the system in grades kindergarten through eleven at the end of school year 1967–1968, together with a return envelope addressed to the Superintendent. Should the defendants satisfactorily demonstrate to the court that they are unable to comply with the requirement of distributing the explanatory letter and choice form by first-class mail, they shall propose an alternative method which will maximize individual notice, i. e., personal notice to parents by delivery to the pupil with adequate procedures to insure the delivery of the notice. The text for the explanatory letter and choice form shall essentially conform to the sample letter and choice form appended to this decree. The Court has been informed that such letter and choice form has been so distributed for the school year 1967–1968 and such distribution shall be, as to such school year, considered compliance with the requirements of the foregoing paragraph.

(g) *Notice to Prospective First Grade and Kindergarten Students.* The same letter and choice form must also be furnished to the parent of each student planning to enter the first grade and kindergarten at pre-registration sessions which will be held for prospective first grade and kindergarten students at each

of the schools in the system during the time designated for the choice period in paragraph II(C). Prospective students will be pre-registered in accordance with procedures followed during the 1965–1966 and previous school years. One week prior to the pre-registration session at each school, written notice of such session shall be delivered to the parents of children attending grades one through eight by delivery to the pupil with adequate procedures to insure the delivery of the notice. Also at that time, the defendants shall arrange for the conspicuous publication of a notice of the pre-registration session at each school in either the New Orleans Times Picayune or New Orleans States-Item.

(h) *Extra Copies of the Explanatory Letter and Choice Form.* Extra copies of the explanatory letter and choice form shall be freely available to parents, students, prospective students, and the general public at each school in the system and at the office of the Superintendent of Education during the times of the year when such schools are usually open.

(i) *Content of Choice Form.* Each choice form shall require of the person exercising the choice the name, address, age of student, school and grade currently or most currently attended by the student, the school chosen, the signature of *one* parent, or other adult person serving as parent, or where appropriate the signature of the student and the identity of the person signing. No statement of reasons for a particular choice, or any witness or other authentication, may be required or requested, without approval of Court.

(j) *Return of Choice Form.* At the option of the person completing the choice form, the choice may be returned by mail, in person, or by messenger to any *school in the school system or to the office* of the Superintendent.

(k) *Choices not on Official Form.* The exercise of choice may also be made by the submission in like manner of any other writing which contains information sufficient to identify the student and indicates that he has made a choice of school.

(l) *Choice Forms Binding.* When a choice form has once been submitted and the choice period has expired, the choice is binding for the entire school year and may not be changed except in cases where, absent the consideration of race, a change is educationally called for or where compelling hardship is shown by the student.

(m) *Preference in Assignment.* In assigning students to schools, no preferences shall be given to any student for prior attendance at a school and, except with the approval of Court in extraordinary circumstances, no choice shall be denied for any reason other than overcrowding. In case of overcrowding at any school, preference shall be given on the basis of the proximity of the school to the homes of the students choosing it, without regard to race or color, but preference may also be given in order to permit siblings living in the same household to attend the same school, or to permit a child to attend a school where his parent may be regularly employed. Standards for determining overcrowding shall be applied uniformly throughout the system.

(n) *Second Choice Where First Choice is Denied.* Any student whose choice is denied must be promptly notified in writing and given his choice of any school in the school system serving his grade level where space is available. The student shall have seven days from the receipt of notice of a denial of first choice in which to exercise a second choice.

(o) *Transportation.*

1) School buses must be routed to the maximum extent feasible in light of the geographic distribution of students, so as to serve each student choosing any school in the system. Every student choosing either the formerly white or the formerly Negro school nearest his residence must be transported to the school to which he is assigned under these provisions, whether or not it is his first

choice, if that school is one mile or more from his home.

2) The School Board shall offer bus transportation for the public schools which shall conform to standards substantially similar to the transportation offered during the 1965–1966, and preceding school years. The School Board shall operate the transportation system so that school bus drivers treat public school children and teachers courteously and with due respect for their physical well being; that school buses do not depart any school less than fifteen minutes after children being bussed have been released from class; that the school bus drivers maintain as regular a morning pick up schedule as practicable; that bus routes maintained for public school children are equivalent as practicable to those maintained during the 1965–1966 school year and preceding school years; and that the public schools be afforded full use of the buses for curricular and extra-curricular functions for which school buses were used during the 1965–1966, and preceding school years.

3) The School Board shall not expend any monies or incur any charges for the transportation of students attending schools other than those operated by the defendant School Board unless such transportation shall not interfere in any way with the transportation of students attending the schools operated by the defendant School Board and unless the defendant School Board has sufficient revenue to operate the school system in accordance with the terms of this Court Order and to offer transportation to students attending schools other than those operated by the defendant School Board.

(p) *Official not to Influence Choice.* At no time shall any official, teacher, or employee of the school system influence any parent, or other adult person serving as a parent, in the exercise of a choice and favor or penalize any person because of a choice made. If the defendant School Board employs professional guidance counselors, such persons shall base their guidance and counseling on the individual student's particular personal, academic, and vocational needs. Such guidance and counseling by teachers as well as professional guidance counselors shall be available to all students without regard to race or color.

(q) *Protection of Persons Exercising Choice.* Within their authority school officials are responsible for the protection of persons exercising rights under or otherwise affected by this decree. They shall, without delay, take appropriate action with regard to any student or staff member who interferes with the successful operation of the plan. Such interference shall include harassment, intimidation, threats, hostile words or acts, and similar behavior. The School Board shall not publish, allow, or cause to be published, the names or addresses of pupils exercising rights or otherwise affected by this decree. If officials of the school system are not able to provide sufficient protection, they shall seek whatever assistance is necessary from other appropriate officials.

## III. PROSPECTIVE STUDENTS

Each prospective new student shall be required to exercise a choice of schools before or at the time of enrollment. All such students known to defendants shall be furnished a copy of the prescribed letter to parents, and choice form, by mail or in person, on the date the choice period opens or as soon thereafter as the school system learns that he plans to enroll. Where there is no pre-registration procedure for newly entering students, copies of the choice forms shall be available at the office of the Superintendent and at each school during the time the school is usually open.

## IV. TRANSFERS

a) *Transfers for Special Needs.* Any student who requires a course of study not offered at the school to which he has been assigned may be permitted, upon his written application, at the beginning of any school term or semester, to transfer to another school which offers courses for his special needs.

## V. SERVICES, FACILITIES, ACTIVITIES AND PROGRAMS

No student shall be segregated or discriminated against on account of race or color in any service, facility, activity, or program (including transportation, athletics, or other extra-curricular activity) that may be conducted or sponsored by or affiliated with the school in which he is enrolled. A student attending school for the first time on a desegregated basis may not be subject to any disqualifications or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student except that such transferees shall be subject to long-standing, non-racially based rules of city, county or state athletic associations dealing with the eligibility of transfer students for athletic contests. All school use or school-sponsored use of athletic fields, meeting rooms, and all other school related services, facilities, activities, and programs such as Commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race or color. All special educational programs conducted by the defendants shall be conducted without regard to race or color.

Further, the students at Belle Chasse School shall be offered full access to the gymnasium, school auditorium and athletic field for activities and programs similar to those during the 1965–1966 school year, including drama, variety shows, sports events, and dances. The students at Belle Chasse shall be allowed to participate in extra-curricular activities similar to those during the 1965–1966 school year, including, school newspaper, organized sports, drama, variety shows and dances.

## VI. SCHOOL EQUALIZATION

a) *Inferior Schools.* In order to bring the courses and facilities at each of the schools in accordance with the principles of a unitary school system, the defendants shall take prompt steps necessary to provide physical facilities, equipment, courses of instruction, textbooks, library books and instructional materials in schools heretofore maintained for Negro students, of quality equal to that provided in schools previously maintained for white students. Courses to be implemented shall include:

Phoenix School — Physics, Geography, Industrial Arts, Drivers Education and Kindergarten;

Scottville School — General Math, Business Education, Industrial Arts, Drivers Education and Kindergarten;

Sunrise School — Business Education, Geography, Business Math, Industrial Arts, Drivers Education and Kindergarten.

———◆———

Physical facilities to be added by the defendant Commission Council and the defendant School Board shall include athletic fields with backstops and otherwise in reasonable condition for organized sports at the three schools attended exclusively by Negro students.

b) *Clerical Staff.* The School Board shall employ clerical staff without regard to race or color, and specifically, shall employ one school secretary for each of the schools attended exclusively by Negro children.

c) *Remedial Programs.* The defendants shall provide remedial education programs which permit students attending or who have previously attended all-Negro schools to overcome past inadequacies in their education.

## VII. NEW CONSTRUCTION

The defendant Commission Council and defendant School Board, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system.

## VIII. FACULTY AND STAFF

a) *Faculty Employment.* Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assigment of teachers in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on a desegregated faculty. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The defendants shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school, provided, however, for the 1967–1968 school year on or before July 15, 1967, the defendant School Board shall offer all faculty and other professional staff members presently in the system re-assignment to the same position and the same school for the 1967–1968 school year as during the 1966–1967 school year.

b) *Dismissals.* Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the Clerk of the Court, serving copies upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed.

c) Scholarships or any other type of financial assistance given by the School Board to teachers or other professional personnel for study shall be given without regard to race or color and, specifically, shall be given to teachers and other professional personnel at the schools attended exclusively by Negro students on the same basis as at the schools attended predominantly by white students.

d) Housing facilities, rent supplements, utilities, payments, or any other type of fringe benefits given by the School Board to teachers or other professional personnel shall be given without regard to race or color and, specifically, shall be given to teachers and other professional personnel at the schools attended exclusively by Negro students on the same basis as the schools attended predominantly by white students.

## IX. INSTITUTION AND RE-ESTABLISHMENT OF COURSES

In addition to the courses to be implemented under the terms of paragraph VI (a) above, the following courses shall be instituted for the 1967–1968 school year:

All Schools: Kindergarten, Drivers Education, Industrial Arts.

## X. SCHOOL LUNCH PROGRAM

The defendant School Board shall offer the school lunch program to all students in the system, including those students who are unable to afford the cost. The size, quality and cost to the students of the lunches shall be substantially similar to the size, quality and cost of lunches during the 1965–1966 school year. If the actual cost of the food purchased requires a raise in cost to the pupil, such cost cannot be raised more than is commensurate with such increase in cost and not more than $.30 per meal.

## XI. MAINTENANCE AND REPAIR

In addition to the physical facilities to be added in accordance with the provisions of paragraph VI (a), steps shall be taken by the defendant Commission Council and the defendant School Board to improve the general maintenance and repair of the school buildings, grounds and facilities, including the repair of broken locks and windows at Buras and Boothville-Venice Schools, Home Economics equipment at Buras, and replace or repair fallen blackboards at Sunrise School. The defendant Commission Council shall take steps to make all major repairs and construction needs, including the repair of the athletic fields, spectator stands and lights at Boothville-Venice High School, Buras High School and Port Sulphur High School and the repair of the leaking roof at the Sunrise High School.

## XII. PRINCIPALSHIPS·

The School Board shall delete the title of "acting principal" and designate permanent principalships at the Port Sulphur School, Buras School, Boothville-Venice School, and Scottville School by August 31, 1967.

## XIII. LIBRARY SERVICE

The Plaquemines Parish Public Library, an agency of the defendant Commission Council, shall reinstitute book-processing Bookmobile service to the Belle Chasse High School, Port Sulphur High School, Buras High School, and Boothville-Venice High School on the same basis as such Bookmobile service was provided during the 1965–1966 school year, except that such service will be offered those schools on a desegregated basis, and shall continue to maintain book processing and Bookmobile service to Scottville High School, Sunrise High School and Phoenix High School.

## XIV. SCHOOL HOURS

The defendant School Board shall re-establish the school hours maintained during the 1965–1966 school year.

## XV. BOOKS, EQUIPMENT AND SUPPLIES

The defendants shall take the necessary measures to return all books, equipment and supplies which have been removed from schools operated by the defendant School Board and which are needed to operate the school system in a manner substantially similar to the manner of operation during the 1965–1966 school year, including any and all text or library books which are needed in any school in the system, the sports equipment removed from the schools, aquariums, recorders and instructional materials belonging to the Boothville-Venice High School.

## XVI. FINANCING THE OPERATION OF THE SCHOOL SYSTEM

The School Board shall finance the operation of the system in accordance with the requirements of this Order.

1) Whenever necessary to operate the school system in accordance with the terms of this Order, the defendant School Board shall make application for financial aid from programs operated by the United States Government, including the Federal Lunch program, the Elementary and Secondary Education Act of 1965 program, and the National Defense Education Act program.

## XVII. REPORTS TO THE COURT

1) *Report on Choice Period.* The defendant School Board shall serve upon

opposing parties and file with the Clerk of the Court on or before August 1, 1967, and on or before October 1, on succeeding school years, a report tabulating by race the number of choice applications and transfer applications received for enrollment in each grade in each school in the system, and the number of choices and transfers granted and the number of denials in each grade of each school. The report shall also state any reason relied upon in denying choice and shall tabulate, by school and by race of student, the number of choices and transfers denied for each such reason.

In addition the report shall show the percentage of pupils actually transferred or assigned from segregated grades or to schools attended predominantly by pupils of a race other than the race of the applicant, for attendance during the 1966–1967 school year, with comparable data for the 1965–1966 school year. Such additional information shall be included in the report served upon opposing counsel and filed with the Clerk of the Court.

2) *Report After School Opening.* The defendant School Board shall, in addition to reports elsewhere described, serve upon opposing counsel and file with the Clerk of the Court within 15 days after the opening of schools for the fall semester of each year, a report setting forth the following information:

i) The name, address, grade, school of choice and school of present attendance of each student who has withdrawn or requested withdrawal of his choice of school or who has transferred after the start of the school year, together with a description of any action taken by the defendants on his request and the reasons therefor.

ii) The number of faculty vacancies, by school, that have occurred or have been filled by the defendants since the Order of this Court or the latest report submitted pursuant to this subparagraph. This report shall state the race of the teacher employed to fill each vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system shall indicate the schools from which and to which the transfers were made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year.

iii) The number of students by race, in each grade of each school.

3) *School Equalization.* By October 1 of each year, the defendant School Board shall report to the Clerk of Court, pupil-teacher ratios, pupil classroom ratios, per pupil expenditures both as to operating and capital improvement costs, and shall outline the steps to be taken and the time within which they shall accomplish the equalization. But, with respect to the specific requirements of paragraph VI (a), the defendants shall make such a report by September 1, 1967.

4) *Institution of Courses.* The defendant School Board shall report to the Clerk of Court by September 1, 1967, the steps taken to comply with the terms of Paragraph IX.

5) *Faculty*

On or before August 1, 1967, the defendant School Board shall submit a report to the Court and the plaintiff showing the number of anticipated faculty and other professional staff vacancies for the school year 1967–1968 and the proposed assignment of persons to fill those vacancies. The plaintiff shall be given an opportunity to file written objections to such assignments on or before August 15, 1967.

The defendants, their agents, servants, employees, representatives and all persons in active concert or participation with them, shall take no action which will prevent or tend to prevent the defendant School Board from operating the public schools of Plaquemines

Parish for the 1966–1967 school year and succeeding school years in substantially the same manner, except for the requirements of this Order, as the public schools were operated for the 1965–1966 school year. The defendants, their agents, servants, employees, representatives and all persons in active concert or participation with them, shall not engage in any of the following actions:

1) The disposition, transfer, conveyance or sale of any real (immovable) property, or personal (movable) property owned, leased or occupied by the defendant School Board to be used for educational purposes by a school system other than the Plaquemines Parish School System or in any other way to interfere with the Orders of this Court.

2) The discouragement of any student or students living in Plaquemines Parish from attendance at the Plaquemines Parish School System, the encouragement of any student or students living in Plaquemines Parish to enroll in schools not operated by the defendant School Board, or the financial support from funds owned or administered by the defendant Commission Council, the defendant School Board, or any other Plaquemines Parish public agency to any school or schools not operated by the defendant School Board, "except in accordance with other provisions of this Order."

3) Any other action or actions which in any way interfere with the performance of the constitutional duty of the defendant School Board to provide equal opportunities to all students in all schools without regard to race or color as required by the Fourteenth Amendment.

The costs and disbursements of this action shall be taxed against the defendants.

This Court may grant such additional relief as the needs of justice may require.

APPENDIX A

PLAQUEMINES PARISH SCHOOL BOARD

Pointe-a-la-Hache, La.

(Date Sent)

Dear Parent:

All grades in our school system will be desegregated next year. Any student who will be entering one of these grades next year may choose to attend any school in our system, regardless of whether that school was formerly all-white or all-Negro. It does not matter which school your child is attending this year. This form is being sent to parents of all students presently in the system. You may select any school you wish.

Every student, white and Negro, who is entering a desegregated grade must make a choice of schools. A parent or other adult serving as parent must sign the choice form. A child enrolling in the school system for the first time must make a choice of schools before or at the time of his enrollment.

The form on which the choice should be made is attached to this letter. It should be completed and returned by
You may mail it in the enclosed envelope, or deliver it by messenger or by hand to any school principal or to the Office of the Superintend-

ent at any time between                and                .  No one may require you to return your choice form before           , and no preference is given for returning the choice form early.

No principal, teacher or other school official is permitted to influence anyone in making a choice or to require early return of the choice form.  No one is permitted to favor or penalize any student or other person because of a choice made.  A choice once made cannot be changed except for serious hardship.

No child will be denied his choice unless for reasons of overcrowding at the school chosen, in which case children living nearest the school will have preference.

Transportation will be provided, if the school chosen is one mile or more from your home.

Your School Board and the school staff will do everything we can to see to it that the rights of all students are protected and that desegregation of our schools is carried out successfully.

Sincerely yours,

Superintendent

## APPENDIX B

### CHOICE FORM

This form is provided for you to choose a school for your child to attend next year.  You have 15 days to make your choice.  It does not matter which school your child attended last year, and does not matter whether the school you choose was formerly a white or Negro school. The form must be mailed or brought to the principal of any school in the system or to the office of the Superintendent, Pointe-a-la-Hache, Louisiana by                    A choice is required for each child.

Name of Child _____
                     (Last)          (First)          (Middle)

Name of parent or other
adult serving as parent _____

If child is entering first grade, date of birth:

                    _____
                     (Month)          (day)          (Year)

Grade child is entering _____

School attended last year _____

Choose one of the following schools by marking an X beside the name.

Name of School          Grade          Location

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

Signature _____

Date _____

To be filled in by Superintendent:

School Assigned _____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## FINDINGS OF FACT

1. The Findings of Fact entered in conjunction with the preliminary injunction of August 26, 1966, are hereby fully incorporated by reference.

2. The Plaquemines Parish School Board, its members and acting superintendent (hereinafter referred .to as "School Board") has operated a school bus transportation system during the 1966–1967 school year for the Plaquemines Parish school system (hereinafter referred to as "school system") and the private non-sectarian schools in Plaquemines Parish.

3. The school bus transportation offered the school system failed to conform to standards of transportation offered by the School Board during the school year 1965–1966 and previous school years, including the alteration of school bus schedules and routes and the lack of availability of school bus transportation for curricular and extra-curricular functions.

4. The School Board has provided more favorable school bus transportation for the private non-sectarian schools than those in the school system, including the fact that the buses provided for the exclusive use of private schools are newer and in better condition than the school buses provided for the use of the public schools and the fact that more convenient bus routes are maintained for students attending the private non-sectarian schools than those maintained for students attending public schools.

5. The School Board, while providing the full transportation needs of the private non-sectarian schools, refused to provide any transportation to the St. Jude Mission School, Diamond, Louisiana, a Catholic school attended by Negro children.

6. The expense of the operation of the transportation system for the private non-sectarian schools in the parish, including the payment of salaries to approximately twelve drivers and the rental, lease or purchase of approximately twelve buses for the exclusive benefit of the private non-sectarian schools, interferes with the operation of the school system.

7. The students at the Belle Chasse School have been denied full access to the school auditorium and athletic field for activities and programs during the 1966–1967 school year, including drama, variety shows, sports events and dances and also have been disallowed an oppor-

tunity to participate in extra-curricular activities.

8. The School Board has not taken steps to provide physical facilities, equipment, courses of instruction, textbooks, library books, and instructional materials in schools attended exclusively by Negroes of quality equal to that provided in the schools previously maintained for white students during the 1965–1966 school year. Rather, at the beginning of the 1966–1967 school year, the School Board withdrew those courses from the schools previously maintained for white students which had not been offered at the schools attended exclusively by Negroes.

9. The School Board refused to implement salary increases for the last half of the present school year for teachers, other professional staff and non-professional staff although it received sixty-one thousand, nine hundred and one dollars and fifty cents ($61,901.50) during the 1966–1967 school year from the State Department of Education which, under the provisions of Act 2 of the Extraordinary Session of the Louisiana Legislature, 1966 Session, could have been used for such purpose. However, the State minimum salary schedule is being met.

10. The School Board has offered financial assistance to all white teachers and other professional staff for additional study although such financial assistance was not offered to the Negro teachers and other professional staff in the school system.

11. The School Board has provided housing, rent supplements, utilities or other fringe benefits to some white teachers and other professional staff in the system and has not offered housing, rent supplements, utilities or other fringe benefits to any Negro teachers and other professional staff in the school system.

12. The School Board has employed a secretary for each of the schools predominantly attended by white students and has not employed secretaries for the schools attended exclusively by Negroes.

13. The School Board raised the cost of school lunches from ten cents ($.10), which was the cost during the 1965–1966 school year, to twenty-five cents ($.25), which has been the cost to students since the lunch program began during the 1966–1967 school year, under Order of this Court. Such increase in cost has resulted in substantial numbers of students who do not eat lunches because of their inability to afford the increased cost of lunches.

14. The School Board and the Plaquemines Parish Commission Council and its members (hereinafter referred to as the Commission Council) have in some instances failed to maintain and repair the school buildings, grounds and facilities adequately. Such failure has resulted in an interference with the operation of the school system.

15. The administrators of the Port Sulphur School, Buras School, Boothville-Venice School and Scottville School are designated "acting principal", which lends to a lack of stability in those schools.

16. The Plaquemines Parish Public Library, an agency of the Commission Council, during former school years, provided Bookmobile service on a racially segregated basis to the public schools without the necessity of an annual request for such service from the principals of those schools. During the 1966–1967 school year, Bookmobile service was withdrawn from the public schools predominantly attended by white students and, instead, was offered at the private non-sectarian schools in the parish even though such service is needed in the public schools.

17. The School Board changed the school hours for the 1966–1967 school year, requiring that students start and end classes one-half hour earlier than during the 1965–1966 school year, resulting in an interference with the operation of the school system.

18. The School Board has transferred large numbers of textbooks from the public schools to the non-sectarian pri-

vate schools although severe textbook shortages existed at Sunrise School.

19. The director of the Plaquemines Recreation Association, an agency of the Commission Council, removed athletic equipment belonging to that agency from the public schools predominantly attended by white students. Some of such equipment had been used by the public schools in regular physical education classes. Such equipment had been kept at the schools and had never been removed from the schools. Although some similar equipment was kept in the schools exclusively attended by Negroes, no such equipment was removed from such schools.

20. Instructional materials and educational equipment was removed from the Boothville-Venice School by teachers who left the school to join the faculty of the private school in the Boothville-Venice area.

21. In addition to the expense incurred by the School Board for the transportation of students to non-sectarian private schools, the School Board has paid approximately $40,000.00 each month since September, 1966, and continues to have such a monthly obligation to the Commission Council for the lease of school properties which were transferred to the Commission Council by the School Board on July 8, 1966, in anticipation of the filing of the complaint in this action.

22. The Commission Council transferred six hundred and seventy-three thousand, five hundred and eighty dollars ($673,580.00) to the School Board's general fund and five hundred and fifty thousand dollars ($550,000.00) to the School Board's Special School Construction fund during the 1965–1966 school year and similar amounts in previous years.

The Commission Council did not budget any money for the School Board for the 1966–1967 school year and has not transferred any money to the School Board during the 1966–1967 school year.

23. The School Board will receive approximately seven hundred and fifteen thousand dollars ($715,000.00) less from the State Department of Education Equalization Fund during the 1967–1968 school year than was received during the 1966–1967 school year if enrollment were to remain the same.

24. The School Board has refused and has indicated a willingness to continue to refuse financial aid from programs operated by the United States Government, including the Federal Lunch Program, Elementary and Secondary Education Act of 1965 and the National Defense Education Act.

25. The United States Department of Interior holds nine hundred and twenty-one thousand, nine hundred and sixteen dollars and sixty-nine cents ($921,916.69) for the Commission Council under the terms of the Refuge Revenue Sharing Act, which requires that such money be used for "schools and roads".

26. The Commission Council has received large sums of money under the terms of the Refuge Revenue Sharing Act since the inception of such Act, and has expended two million, eight hundred and twenty thousand, four hundred and forty three dollars and fifty-four cents ($2,820,443.54) for the public schools of the Parish. The balance has been expended for the roads of the Parish.

27. Unless permanently enjoined by this Court, the School Board will continue to:

(a) Refuse to institute a desegregation plan for the public schools which meets current legal standards.

(b) Provide educational opportunities and facilities to Negro students which are inferior to those which they provide to white students.

(c) Refuse to provide the necessary support and maintenance of the public schools.

28. Unless enjoined by this Court all the defendants will continue to in-

terfere with the orderly desegregation of the public schools.

## CONCLUSIONS OF LAW

1. United States District Courts in the Fifth Circuit are bound by the opinion and model decree entered by the Fifth Circuit Court of Appeals, en banc, in United States et al. v. Jefferson County Board of Education et al., 380 F.2d 385, decided on March 29, 1967.

2. The Conclusions of Law entered in conjunction with the preliminary injunction of August 26, 1966, are hereby fully incorporated by reference.

3. The location of any new school and the expansion of any existing school have the objective of eradicating the vestiges of the dual system, to the extent consistent with the proper operation of the school system as a whole.

4. Remedial programs must be provided to permit students attending or who have previously attended all-Negro schools to overcome past inadequacies in their education.

5. Scholarships for additional study or fringe benefits, such as housing, rent supplements and utilities payments which are provided to teachers and other professional staff must be provided on a non-discriminatory basis.

6. Where there is a conscious effort on the part of the School Board and governing body to debilitate or lower the standard of education of a public school system to interfere with the orderly desegregation of that school system, the Court may grant appropriate relief including relief which is based on past experience and practice, to ensure that such system will operate in accordance with minimum legal requirements.

7. This Court is without authority in law to order the Commission Council to accept funds due it under the Refuge Revenue Sharing Act on conditions stipulated by the United States Department of Interior or otherwise.

8. The Court may require the School Board to take steps to finance the operation of the school system in accordance with minimum legal requirements.